IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ARTHUR H. HOLMES, IV,              )
    Plaintiff,                   )
                                   )
    v.                          )          Civil No. 3:14cv185 (JRS)
                                   )
CAROLYN W. COLVIN,                 )
Acting Commissioner of Social Security,  )
    Defendant.                  )
_____ )

## REPORT AND RECOMMENDATION

Arthur H. Holmes, IV ("Plaintiff") is forty-five years old and previously worked as an

electrician, a stock clerk and a cashier. On January 18, 2011, Plaintiff applied for Social Security

Disability Benefits ("DIB"). On January 19, 2011, Plaintiff applied for Supplemental Security

Income ("SSI") under the Social Security Act ("Act"). Both claims stemmed from gout flares,

with an alleged onset date of February 2, 2008. Plaintiff's claims were denied both initially and

upon reconsideration. On October 15, 2012, Plaintiff, represented by counsel, appeared before

an Administrative Law Judge ("ALJ"). At the hearing, Plaintiff amended his alleged onset date

to May 1, 2011. The ALJ denied Plaintiff's claims in a written decision on November 21, 2012.

On January 22, 2014, the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by failing to indicate the weight that she gave to the opinions of

Plaintiff's treating physicians, as well as the state agency medical consultant. Plaintiff further

contends that substantial evidence does not support the ALJ's determination that Plaintiff would

likely miss only one day of work per month due to gout flares. Defendant responds that the record does not contain medical opinions from Plaintiff's treating physicians, that the ALJ sufficiently explained the weight that she afforded to the state agency physician's opinion and that even if she did not, the ALJ's failure to do so was harmless and that substantial evidence supported the ALJ's determination that Plaintiff would likely miss only one day of work per month. The parties have submitted cross-motions for summary judgment that are now ripe for review. Having reviewed the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED and that the final decision of the Commissioner be VACATED and the case REMANDED.

## I. BACKGROUND

Because Plaintiff alleges that the ALJ erred in her analysis of the opinions of Plaintiff's treating physicians and the state agency physician, and that substantial evidence failed to support the ALJ's determination that Plaintiff would only miss one day of work per month, Plaintiff's education and work history, medical records, function reports, hearing testimony and the state agency physician's opinion are summarized below.

A. Education and Work History

Plaintiff was forty-one years old when he applied for DIB and SSI and was forty-two years old on his amended alleged disability onset date. (R. at 16, 34-35.) Plaintiff completed school through the eighth grade, earned a General Equivalence Diploma ("GED") and received vocational training to be an electrician. (R. at 36-37.) Plaintiff previously worked as an electrician's helper, a grocery store stock clerk and a convenience store cashier. (R. at 37-39.)

2

### B. Medical Records

#### 1. Pre-2011 Medical Records[1]

In May 2008, Plaintiff sought emergency medical attention for pain and swelling in his left foot and ankle at CJW Medical Center. (R. at 252-57.) X-ray imaging of Plaintiff's left foot revealed "degenerative-type findings," but no acute injury or bony abnormality. (R. at 257.) Blood work indicated high levels of uric acid, and Plaintiff was diagnosed with gout. (R. at 252-55.) Plaintiff was prescribed pain medication and discharged with instructions to return if his symptoms changed or worsened. (R. at 252.)

#### 2. Kim Clements, M.D.

On April 12, 2011, Plaintiff sought treatment at Patient First following a work-related injury that he suffered while attempting to maintain his balance on a ladder the previous day. (R. at 273.) Plaintiff complained of pain in his left shoulder, lower back and left knee. (R. at 273.) Kim Clements, M.D. evaluated Plaintiff and observed that his left knee was mildly swollen and mildly tender to palpitation on the lateral portion. (R. at 273.) Dr. Clements noted that Plaintiff had limited range of motion in his left shoulder. (R. at 273.) Dr. Clements reported that Plaintiff was experiencing muscle spasms on the left side of his back and the right side was tender to palpitation, but there was no bony vertebral tenderness. (R. at 273.) Imaging of Plaintiff's knee, shoulder and back revealed no acute abnormalities, but showed mild disc space narrowing at the L4-L5 vertebra, as well as anterior marginal osteophytes in his lower back.[2] (R. at 273.) X-rays

---

[1]  At his hearing before the ALJ on October 15, 2012, Plaintiff amended his alleged onset date to May 1, 2011. Therefore, the Court focuses its attention primarily on Plaintiff's medical records during the relevant period: May 1, 2011 through November 21, 2012, the date of the ALJ's opinion. The Court briefly summarizes Plaintiff's relevant pre-2011 medical records that appear in the record for background purposes.

[2]  Marginal osteophytes are more commonly known as bone spurs.

of Plaintiff's left knee showed mild osteoarthritis and trace joint effusion, but no fracture. (R. at 273.) Dr. Clements diagnosed Plaintiff with knee, lumbar and shoulder sprains, prescribed Vicodin and Lodine, and limited Plaintiff to light duty work for one week with no lifting, pushing or pulling greater than fifteen pounds with his left shoulder, no overhead work, no bending and careful use of his left knee. (R. at 273-74.)

On April 15, 2011, Plaintiff returned to Patient First for a follow-up visit. (R. at 274.) His shoulder felt better, but remained stiff and his left knee and back still caused him pain. (R. at 274.) Dr. Clements observed that Plaintiff moved his knee very stiffly and that the knee was still swollen and tender to palpitation on the lateral aspect. (R. at 274.) Dr. Clements referred Plaintiff to an orthopedic specialist. (R. at 274.)

### 3. Christopher Wise, M.D.

On December 27, 2011, Plaintiff saw Christopher Wise, M.D., a rheumatologist in the VCU Health System's Rheumatology Division, for an initial office visit regarding his gout. (R. at 303.) Plaintiff informed Dr. Wise that he had been diagnosed with gout ten to eleven years earlier after an attack of pain and swelling in his foot. (R. at 303.) The gout flares in Plaintiff's foot reoccurred every four to eight months for a few years, but within the past five years, the attacks increased in frequency and spread to his hands, elbows, ankles and knees. (R. at 303.) Plaintiff reported that he currently experienced gout attacks twice per month. (R. at 303.) Plaintiff told Dr. Wise that his right ankle remained swollen all the time. (R. at 303.)

Dr. Wise noted that Plaintiff lost three fingers[3] on his right hand in a lawnmower accident as a child and had been diagnosed with hypertension in 2011. (R. at 303.) Regarding his family history, Plaintiff told Dr. Wise that his mother had diabetes mellitus and his grandfather had

---

[3]      Dr. Wise erroneously indicated that Plaintiff was missing three fingers when, in fact, only two were amputated. (R. at 284.)

gout. (R. at 303.) Plaintiff reported being unemployed since April due to his joint problems and that, on average, he smoked a half pack of cigarettes and drank two beers each day. (R. at 303.) He remembered taking Colchicine and Aleve in the past, and presently took Colcrys, which had been "helpful." (R. at 303.)

Upon examination, Dr. Wise opined that Plaintiff appeared healthy and not in distress. (R. at 303.) Plaintiff's hair, scalp, eyes, mouth, neck, heart, lungs, abdomen, skin and peripheral pulses appeared normal, as did his neurological function. (R. at 303-04.) Plaintiff had full range of motion without pain in his cervical and lumbar spine. (R. at 304.) Dr. Wise observed mild enlargement in Plaintiff's right second metacarpophalangeal ("MCP") joint and right ankle, but no soft tissue swelling, effusions, warmth or nodules of tophi. (R. at 304.) Dr. Wise assessed Plaintiff as having probable progressive gout, hypertension and chronic renal disease. (R. at 304.) Dr. Wise prescribed Allopurinol for Plaintiff's gout and recommended that Plaintiff take it continuously, regardless of whether he was having a gout attack. (R. at 304.) In addition, Dr. Wise recommended that Plaintiff moderate his alcohol intake and return for a follow-up in four months. (R. at 304.)

### 4. Andrew Eschenroeder, Medical Resident

On October 9, 2012, Plaintiff returned to VCU Health System for a follow-up appointment regarding his gout. (R. at 321.) Plaintiff saw Mr. Andrew Eschenroeder, a medical resident in the Rheumatology Department, complaining primarily of left knee pain. (R. at 321.) Plaintiff complained of continuing gout flares in his hands, elbows, knees and feet, and worsening left knee pain. (R. at 321.) Plaintiff rated his knee pain as eight out of ten. (R. at 321.) He described the pain as constant, but waxing and waning in severity. (R. at 321.) He

explained that during an attack, his knee joint became hot and swollen for four to five days, with two to three days of relief before the next attack. (R. at 321.)

Plaintiff told Mr. Eschenroeder that he went to the emergency room a month earlier during a similar flare of symptoms and had fluid drained from his left knee. (R. at 321.) He was prescribed pain medication and did not seek follow-up care after he was discharged. (R. at 321.) Mr. Eschenroeder noted that Plaintiff was assessed for a possible meniscus tear the previous year by an orthopedist, but Plaintiff had not scheduled an MRI to confirm the diagnosis. (R. at 321.) Plaintiff informed Mr. Eschenroeder that he also experienced gout attacks every two weeks in his third right MCP, both elbows and his big toes on both feet. (R. at 321.) During attacks, he took two Colchicine with minimal relief. (R. at 321.) Plaintiff told Mr. Eschenroeder that although he initially took the Allupurinol only during a gout attack, he now took it every day. (R. at 321.) In addition, he takes Naproxen daily. (R. at 321.) Plaintiff reported that he could not work because of his pain. (R. at 321.) He admitted to drinking three to four beers per week, smoking one pack of cigarettes per day and eating red meat and seafood regularly. (R. at 321.)

Mr. Eschenroeder examined Plaintiff and remarked that Plaintiff's left knee pain disrupted his gait. (R. at 322.) He noted swelling in the third MCP joint on the right hand, but no tenderness, full range of motion in both arms and swelling near the elbow on the right side. (R. at 322.) Upon examination, Plaintiff's left knee was warm, swollen, tender to palpitation, and pain limited his range of motion. (R. at 322.) His right knee was not tender and had full range of motion. (R. at 322.) Plaintiff's left big toe was tender to palpitation, and both ankles exhibited full range of motion without pain. (R. at 322.) Mr. Eschenroeder rated Plaintiff's left leg strength on knee extension and flexion as a four out of five, and rated his right leg five out of five. (R. at 322.)

Mr. Eschenroeder opined that Plaintiff had poorly controlled gout, as exhibited by his biweekly flares in his hands, elbows and feet, and his persistent left knee pain with weekly superimposed flares. (R. at 322.) Mr. Eschenroeder prescribed Prednisone to be taken daily, doubled Plaintiff's daily dose of Naproxen and advised Plaintiff to quit drinking alcohol and limit his intake of red meat and seafood. (R. at 322.) Mr. Eschenroeder also assessed Plaintiff as having a renal insufficiency and a possible left meniscal tear and ordered blood work that day and follow-up testing one week later. (R. at 322-23.)

### 5.  Other Medical Sources

#### a.  Judith Falzoi, F.N.P.

On July 14, 2011, Plaintiff sought treatment at Appomattox Area Health & Wellness Center for his gout and unresolved left knee and back injuries resulting from his April 2011 ladder accident. (R. at 283-85.) Judith Falzoi, F.N.P., M.S. saw Plaintiff and noted that his active problems included hypertension and frequent episodes of gout. (R. at 284-85.) Nurse Falzoi also indicated that Plaintiff previously had two fingers on his right hand amputated and a right thumb tendon injury in 2007. (R. at 284.) On examination, Nurse Falzoi observed that Plaintiff was groomed, smiling, pleasant and obese. (R. at 286.) He had palpable pulses and no edema in his extremities. (R. at 286.) Plaintiff had pain in his lower back, left knee and left shoulder. (R. at 286.) He exhibited full range of motion in his back and shoulders, and crepitus in his left knee. (R. at 286.) Nurse Falzoi recommended that Plaintiff decrease his beer and tobacco consumption, and prescribed him medication for pain and hypertension. (R. at 285.)

On August 15, 2011, Plaintiff saw Nurse Falzoi for a follow-up visit. (R. at 287.) During that appointment, Plaintiff reported that he had gone to the emergency room two weeks earlier for a swollen right elbow but did not stay for evaluation, because his pain went away. (R. at

287.) At the time of his appointment, some elbow swelling remained, but Plaintiff was not in pain. (R. at 287.) He told Nurse Falzoi that he had appointments scheduled at VCU Health System for his knee pain and lower back pain. (R. at 287.) Plaintiff informed Nurse Falzoi of his 2007 right thumb tendon injury and complained of limited movement in his right thumb. (R. at 287.) Nurse Falzoi observed decreased strength, but no obvious thumb deformities. (R. at 288.) She referred him to the VCU Health System Hand Clinic. (R. at 287.)

### b. Mary Weber, P.T.

In October 2011, Plaintiff went to VCU Health System for two physical therapy appointments at the referral of Anne Tapscott, N.P. (R. at 294.) Mary Weber, P.T. saw Plaintiff, who complained primarily of lower back pain. (R. at 294.) At Plaintiff's initial visit, Weber observed that Plaintiff had antalgic gait with decreased weight bearing on his left leg due to gout, as well as decreased cadence and step length. (R. at 294.) Plaintiff exhibited poor sequencing when he walked, namely, no heel strike and no push-off. (R. at 294.) Ms. Weber noted that Plaintiff was unable to push off of his left foot due to pain from his gout and fitted Plaintiff with a straight cane. (R. at 294.) Plaintiff exhibited active range of motion with minor limitation in his left knee, and four out of five on bilateral manual muscle testing. (R. at 295.) Both his light touch sensation and deep tendon reflexes were intact. (R. at 296.) Ms. Weber observed lumbar spine dysfunction. (R. at 296.) Ms. Weber assessed Plaintiff as having poor posture, pain, decreased flexibility and weakness in his bilateral upper and lower extremities as well as his core, and reported that his impairments included pain, posture, and decrease in spinal and extremity active range of motion and strength. (R. at 296.) She instructed Plaintiff to perform exercises at home to improve these issues. (R. at 296.)

During his follow-up appointment, Plaintiff reported that the exercises helped. (R. at 298.) He told Ms. Weber that he was "still tight," but was using the cane and a lumbar roll in the car. (R. at 298.) Plaintiff complained of pain at the insertion of his left Achilles tendon and reported that this area was usually swollen. (R. at 298.) He showed Ms. Weber a large node on his left elbow. (R. at 298.) Ms. Weber performed a physical evaluation and determined that Plaintiff's lumbar range of motion when bending forward was limited by half due to pain and was within functional limits with pain in all other directions. (R. at 298.) Ms. Weber assessed Plaintiff as having increased pain in various locations versus his previous appointment. (R. at 298.)

### c. John Cochran, PA-C

On September 7, 2012, Plaintiff went to the emergency room for left knee pain. (R. at 306-07.) John Cochran, PA-C saw Plaintiff and observed tenderness in his left knee. (R. at 307.) Plaintiff reported that he was experiencing severe aching pain in his left knee and that he had a history of gout. (R. at 308.) Mr. Cochran assessed Plaintiff as having gouty arthritis, prescribed him narcotic pain medication and discharged him in stable condition. (R. at 307-09.)

### C. Function Reports

On June 22, 2011, Plaintiff completed a Function Report. (R. at 199-214.) Plaintiff lived alone. (R. at 199.) When in pain, Plaintiff's daily routine included lying down, getting up to use the rest room and lying back down. (R. at 199.) He stated that his condition affected his sleep, as well as his personal care activities. (R. at 200.) Plaintiff indicated that he did not dress, bathe, groom or feed himself when in pain, and that his pain worsened when he moved around to use the bathroom. (R. at 200.) Plaintiff did not need reminders to take care of his personal needs or

grooming or taking his medicine. (R. at 201.) Plaintiff reported making his own meals daily. (R. at 201.)

Plaintiff did not do house or yard work, because his pain was too intense. (R. at 201-02.) Plaintiff indicated that he did not go outside when in pain. (R. at 202.) When going out, he rode in a car and could go out alone, but could not drive because he did not have a car or a driver's license. (R. at 202.) He shopped in stores for whatever he needed, including household necessities and food. (R. at 202.) He typically shopped once a month for an hour. (R. at 202.) Plaintiff reported that he could pay bills, handle a savings account, count change and use a checkbook or money order. (R. at 202.)

Plaintiff listed playing chess as his hobby, and said that he could play "ok." (R. at 203.) When asked how his hobbies and interests had changed since his condition began, he stated that he "can't do anything when in pain." (R. at 203.) He did not spend time with others, and went to church when he was not in pain. (R. at 203.) He did not need reminders to go places, nor did he need anyone to accompany him. (R. at 203.) Plaintiff indicated that he did not have any problems getting along with others. (R. at 204.)

Plaintiff's condition affected his ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, complete tasks, concentrate, use his hands and get along with others. (R. at 204.) When in pain, Plaintiff could not move around, and he laid or sat in one place, because his movement was limited. (R. at 204.) Plaintiff stated that he could only walk "three hops" before needing to stop and rest, and that he typically needed to rest for seven minutes before continuing. (R. at 204.) He could not pay attention for long, but he could finish what he started and follow spoken and written instructions "ok." (R. at 204.) Plaintiff did not have trouble getting along with authority figures and had never been fired or laid off from a job because of problems getting

along with others. (R. at 205.) He handled stress and changes in routine "ok." (R. at 205.) Since April 2011, Plaintiff had used crutches prescribed by a doctor whenever he had gout. (R. at 205.)

On his Pain Questionnaire, Plaintiff stated that he had aching and throbbing pain in his right hand, left knee and right foot. (R. at 215.) He experienced this pain at least three times per month for four to five days at a time. (R. at 215.) Walking and using his hand caused the pain or made it worse, and the pain moved to his left foot, ankle, toes and elbow. (R. at 215.) He stated that pain had limited his activities for five years. (R. at 216.) The only thing that alleviated Plaintiff's pain was time. (R. at 216.)

D. State Agency Physician[4]

On August 2, 2011, James Darden, M.D. assessed Plaintiff's residual functional capacity ("RFC"). (R. at 78-86.) Dr. Darden diagnosed Plaintiff's impairments — major joint dysfunction and amputations — as being severe, and opined that Plaintiff's impairments could reasonably be expected to produce his pain and other symptoms. (R. at 82.) Nevertheless, Dr. Darden concluded that the intensity and limiting factors that Plaintiff alleged were "not entirely well supported by objective evidence." (R. at 83.) Dr. Darden opined that Plaintiff had some exertional limitations: he could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds; he could stand, walk and/or sit approximately six hours in an eight-hour workday with normal breaks; and he had unlimited ability to push and pull objects. (R. at 83.)

---

[4] Dr. Darden was the second state agency physician to review Plaintiff's claims. The first state agency physician, Dr. David Williams, reviewed Plaintiff's record and issued a report on March 30, 2011. (R. at 66-75.) Based on his review, Dr. Williams opined that there was insufficient information in Plaintiff's record to assess the severity of his impairments. (R. at 68-69.) Because Dr. Williams conducted his review before Plaintiff's amended alleged onset date and was unable to fully evaluate Plaintiff's impairments, the Court focuses its attention on Dr. Darden's review.

Dr. Darden concluded that Plaintiff had no postural limitations and had limited gross and fine manipulation ability with his right hand due to his two amputated fingers. (R. at 84.) Plaintiff had no visual, communicative or environmental limitations. (R. at 84.)

E. Plaintiff's Testimony

On October 15, 2012, Plaintiff, represented by counsel, testified at a hearing before the ALJ. (R. at 31.) Plaintiff was forty-three years old and single, and he lived with his mother, stepfather and brother. (R. at 34-36.) He had a thirteen-year-old daughter who lived in North Carolina, whom he had not seen in about six months. (R. at 35-36.) Plaintiff completed school through the eighth grade and had a GED. (R. at 36.) He could read, write and could solve simple math problems. (R. at 36.) After he left school, he attended Woodrow Wilson Rehabilitation Center and trained to be an electrician, but did not receive a certificate. (R. at 36-37.)

Plaintiff stated that he was not working and did not have any income at the time of the hearing. (R. at 37.) He received $200 per month in food stamps and did not pay rent, because he lived with his mother. (R. at 37.) Plaintiff testified that he had last worked around January of the previous year, but he was unsure of the exact month. (R. at 37.) He stated that he had worked as a full-time electrician's helper until he stopped working in April of that year. (R. at 38.) He estimated that he had worked in that particular job for about two months, but that he had worked as an electrician's helper for approximately ten years. (R. at 38.) Within the past fifteen years, Plaintiff worked as a full-time stock clerk at Food Lion for approximately six months, and as a part-time cashier at 7-Eleven for approximately four months. (R. at 38-39.) The heaviest weight that he had to lift or carry as a stock clerk was between thirty and forty pounds, and as an electrician's helper, he had to lift or carry between fifty and sixty pounds. (R. at 39.)

12

Plaintiff testified that he was unable to work because of the pain and swelling caused by his gout. (R. at 40.) He explained that on mornings when his gout flared, the swelling and pain left him unable to get out of bed. (R. at 40.) On those days, he remained in bed all day. (R. at 40, 44-45.) He had pain in his left knee, left foot, big toe, right hand and sometimes in his right foot. (R. 40.) Plaintiff described the pain as feeling "like a sledgehammer" pounding on it. (R. at 41.) Plaintiff experienced the pain approximately twice a week and sometimes went three to five days without having it again. (R. at 41.) The pain ebbed and flowed, and he estimated that he experienced it four or five times a month. (R. at 41.) Although Plaintiff could generally feel attacks coming on, he did not experience them at predictable intervals. (R. at 54.)

Plaintiff described his daily routine on a good day as follows: he would get up, sit outside, come back inside, watch television and eat. (R. at 52.) He might go to a friend's house or they might come over to his house, and they would just sit around and talk. (R. at 52.) He might go to the store. (R. at 52.) On a bad day, Plaintiff testified that he would stay in bed and try to sleep. (R. at 52.) His gout attacks sometimes lasted two to three days, and he would spend that entire period of time in bed, getting up only to go to the bathroom. (R. at 53.) He kept a commode by his bedside, so that he would not have to get out of his bed and walk to the bathroom to urinate during his gout attacks. (R. at 53-54.) During these periods of gout, he would limit his food intake to minimize the number of times he would have to get up and use the bathroom. (R. at 54.)

During a gout attack, Plaintiff would lie in bed and take his pain medicine. (R. at 41.) The medication made him drowsy, so he tried to sleep, but sometimes had difficulty doing so.

(R. at 41.) As of the hearing, Plaintiff's medication regimen included Allopurinol,[5] Naproxen, Prednisone and Colchicine. (R. at 42-43.) Plaintiff took the Allopurinol daily, and took the Colchicine once a day for gout attacks. (R. at 42-43.) He testified that the once-daily Colchicine helped sometimes. (R. at 42.) Naproxen eased some of his pain, but not completely. (R. at 46.) Similarly, Hydrocodone helped with the pain but did not totally alleviate it, and it made him tired. (R. at 46.) When asked about the severity of his pain before he takes his medication, Plaintiff rated it a ten out of ten. (R. at 46.) Once his medicine takes effect, the pain subsides to a seven or eight on a ten-point scale. (R. at 46-47.)

Plaintiff testified that his appointments with his doctor at VCU were "real stretched out," and that if he felt pain, he went to the emergency room. (R. at 43.) He said that he had been to the doctor approximately ten times during 2012 alone and that he had to wait four months for his most recent appointment at VCU. (R. at 43.)

Plaintiff testified that he sometimes had difficulty sitting, because his knee would lock up and he would have difficulty straightening it. (R. at 43-44.) Sometimes, the knee would lock up if he went from sitting to standing, and when he stood, he would find it difficult to bend it. (R. at 43.) Plaintiff could sit comfortably for an hour at a time, at most, and could stand comfortably for thirty minutes to one hour at a time. (R. at 44.) When not in pain, Plaintiff could walk three blocks, but he could not walk at all if he was in pain. (R. at 44.) He could lift fifteen pounds comfortably. (R. at 44.)

Plaintiff stated that he attempted to bathe and dress himself daily, but when he was in pain, he had difficulty doing so. (R. at 47.) He cooked himself meals once a week and generally made food that he could put in the oven. (R. at 47.) He stated that he recently learned that

---

[5]     During the hearing, Plaintiff testified that he took Albuterol, but the ALJ sought clarification and Plaintiff corrected himself, stating that he took Allupurinol. (R. at 42-43.)

seafood aggravates gout, so he stayed away from it. (R. at 45.) Plaintiff sometimes cleaned and vacuumed his room. (R. at 47-48.) Plaintiff's mother did his laundry. (R. at 48.)

Plaintiff testified that he did not have a driver's license, and that his license had been suspended previously due to court fines. (R. at 48.) A friend gave him a ride on the day of the hearing. (R. at 49.) Plaintiff watched approximately two hours of television during an average day and had no trouble following and understanding what he watched. (R. at 49.) He spent approximately an hour per day on the Internet playing games and using Facebook. (R. at 49-50.) Plaintiff's main hobby was playing chess, and he typically played chess on the computer for about an hour each day. (R. at 50.) He spent time with his friends, sitting and talking, about once per week. (R. at 50.) Sometimes his friends came to his house, and about once per month, he went to their houses. (R. at 50-51.) He saw his family members and sometimes went to their houses. (R. at 51.) Plaintiff did not belong to any clubs or organizations, and went to church two or three times per year. (R. at 51.) He went to the grocery store with his mother approximately once per month. (R. at 51.)

## II.    PROCEDURAL HISTORY

Plaintiff previously applied for DIB once before, and his application was denied at the initial level in April 2010. (R. at 178.) On January 18, 2011, Plaintiff applied for DIB and on January 19, 2011, he applied for SSI. (R. at 16.) On both applications, Plaintiff alleged an onset date of February 2, 2008. (R. at 16.) Plaintiff sought disability due to missing two fingers on his right hand due to amputation, as well as gout flares affecting his right hand, right foot, left knee, left foot and big toe. (R. at 20.) Plaintiff's claims were denied both initially on March 30, 2011, and upon reconsideration on August 4, 2011. (R. at 16.)

Plaintiff filed a written request for a hearing, and on October 15, 2012, Plaintiff, represented by counsel, testified before the ALJ during a hearing. (R. at 16.) At that hearing, Plaintiff sought and was granted leave to amend his alleged onset date to May 1, 2011. (R. at 16.) On November 21, 2012, the ALJ issued a written decision denying Plaintiff's claims. (R. at 16-24.) On January 22, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

### III.    QUESTIONS PRESENTED

1. Did the ALJ properly evaluate the opinions of Plaintiff's physicians?

2. Did the ALJ properly evaluate the opinion of the state agency physician?

3. Was the ALJ's determination that Plaintiff would not miss more than one day of work per month supported by substantial evidence?

### IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla but less than a preponderance, and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). Although the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence on the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. §§ 404.1572(a), 416.972(a). Gainful

work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. §§ 404.1572(b), 416.972(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. §§ 404.1572(c), 416.972(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as a severe impairment entitling one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. §§ 404.1520(c), 416.920(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) that lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[6] based on an assessment of the claimant's RFC[7] and the "physical and mental demands of work [the claimant] has done in

---

[6]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[7]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant can perform other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. 20 C.F.R. §§ 404.1560, 416.960. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

---

perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

# V.    ANALYSIS

## A. The ALJ's Decision

On October 15, 2012, the ALJ held a hearing during which Plaintiff, represented by counsel, and a VE testified. (R. at 31-62.) On November 21, 2012, the ALJ issued a written opinion and determined that, based on Plaintiff's January 2011 applications, Plaintiff was not disabled under the Act. (R. at 16-24.)

The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. at 17-23.) First, the ALJ determined that Plaintiff met the insured status requirements of the Act through March 31, 2012, and that Plaintiff had not engaged in SGA since Plaintiff's amended alleged onset date. (R. at 18.) At step two, the ALJ found that Plaintiff suffered the severe impairments of gout, obesity and the loss of two fingers on his right hand to amputation. (R. at 18.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) At step four, the ALJ concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with some manipulative limitations. (R. at 19-22.) The ALJ found that Plaintiff could not perform any of his past relevant work. (R. at 22.) Finally, at step five of her analysis, the ALJ concluded that based on Plaintiff's age, education, work experience and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. at 22.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 23.)

Plaintiff challenges the ALJ's decision on three grounds. First, Plaintiff argues that the ALJ erred by failing to state the weight that she afforded to Plaintiff's treating physicians.

(Appellant's Opening Br. in Supp. of His Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 9) at 3.) Second, Plaintiff argues that the ALJ erred by failing to indicate with any specificity the weight that she gave to the state agency physician's opinion. (Pl.'s Mem. at 6.) Third, Plaintiff argues that the ALJ erred in her RFC determination, specifically by concluding that Plaintiff would likely miss one day of work per month due to his gout. (Pl.'s Mem. at 7.)

B. The ALJ erred by failing to explain the weight that she gave to Plaintiff's treating physicians.

Plaintiff argues that the ALJ erred by neglecting to mention Plaintiff's treating physicians specifically and by failing to provide any indication of the weight that she afforded to their opinions. (Pl.'s Mem. at 3.) In response, Defendant makes two arguments. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 10) at 13.) First, Defendant asserts that Dr. Wise and Mr. Eschenroeder[8] were not "treating physicians" under the Act, because each only saw Plaintiff once. (Def.'s Mem. at 13.) Defendant attacks Plaintiff's characterization of Dr. Wise and Mr. Eschenroeder as treating physicians and urges the Court to reject Plaintiff's argument on that basis alone. (Def.'s Mem. at 13.) Second, Defendant argues that neither Dr. Wise nor Mr. Eschenroeder rendered medical opinions, because their treatment notes merely recited Plaintiff's subjective symptoms. (Def.'s Mem. at 14.) Because Dr. Wise and Mr. Eschenroeder were not treating physicians and their reports were not medical opinions,

---

[8]     Defendant further contends that Eschenroeder does not qualify as an "acceptable medical source" under the Act, because he was a medical resident and not a licensed physician at the time that he evaluated Plaintiff. (Def.'s Mem. at 13 (citing 20 C.F.R. §§ 404.1513(a), 416.913(a)) (defining "acceptable medical sources.").) Plaintiff argues that "[a] medical resident is a medical graduate. By definition Dr. Eschenroeder has a medical doctorate." (Rebuttal Br. of Pl. in Supp. of His Mot. for Summ. J. ("Pl.'s Reply") (ECF No. 11) at 1 n.1.) The parties have not presented sufficient evidence for the Court to determine whether Eschenroeder was a fully licensed physician under Virginia law when he saw Plaintiff; therefore, the Court does not opine on this issue. The Court will refer to him as "Mr. Eschenroeder" for the sake of clarity, but this should not be interpreted as indicative of the Court's position on this issue.

Defendant claims, the ALJ was not required to explain the weight that she afforded them. (Def.'s Mem. at 13-15.)[9] Indeed, Defendant argues that because the ALJ cited the Wise and Eschenroeder reports, she sufficiently considered them. (Def.'s Mem. at 15.) The Court considers Defendant's arguments in reverse order.

### 1. Both Dr. Wise and Mr. Eschenroeder rendered medical opinions.

Defendant contends that Dr. Wise's and Mr. Eschenroeder's treatment reports are not medical opinions, because "neither provider rendered a medical opinion that Plaintiff had specific limitations, let alone that he would require two absences from work per month." (Def.'s Mem. at 15.) The Wise and Eschenroeder reports, Defendant argues, "are nothing more than a recitation of Plaintiff's subjective symptoms, and certainly do not comprise medical opinions that Plaintiff had particular functional restrictions stemming from gout." (Def.'s Mem. at 14.) Plaintiff responds that "subjective symptoms almost always form a basis of a medical opinion" and that although some subjective reports of symptoms should be disregarded, that does not render a patient's subjective complaints as an improper basis for a physician's opinion. (Rebuttal Br. of Pl. in Supp. of His Mot. for Summ. J. ("Pl.'s Reply") (ECF No. 11) at 3.)

Regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). As the word "including" suggests, the listed considerations that follow are illustrative rather than mandatory or exhaustive. *See, e.g.*, *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995) ("Usually, the ALJ should request a medical source statement describing the

---

[9]     Notably, however, Defendant does not deny that the ALJ failed to indicate the weight that she afforded to their respective reports. (Def.'s Mem. at 13; Pl.'s Reply at 1.)

types of work that the applicant is still capable of performing. The absence of such a statement, however does not, in itself, make the record incomplete."); 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) ("Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete."). Thus, no one factor is determinative and the Court must consider the contents of each physician's statements or reports to determine whether they qualify as a medical opinion.

In his December 2011 report, Dr. Wise recorded Plaintiff's self-reported symptoms as well as his family and social history. (R. at 303.) He performed a full-body, system-by-system physical examination of Plaintiff and reported that, aside from mild enlargement of the right second MCP and right ankle, everything appeared normal. (R. at 303-04.) He reviewed Plaintiff's medication regimen and referenced previous lab results. (R. at 303-04.) Only after going through all of this information did Dr. Wise list his diagnoses of probable progressive gout, hypertension and chronic renal disease, and then set forth his treatment plan. (R. at 304.) His plan included blood work, a new prescription medication to help control Plaintiff's gout over the long-term and a follow-up appointment. (R. at 304.) Thus, Dr. Wise's report reflected his judgment that Plaintiff had gout, that upon examination Plaintiff exhibited some musculoskeletal symptoms of gout but not others, a report of Plaintiff's symptoms based on Plaintiff's self-reporting as well as Dr. Wise's physical examination, his diagnoses and his belief that continuous therapy could result in eventual control of Plaintiff's gout. (R. at 304.) Although Dr. Wise did not specifically opine on Plaintiff's abilities or impairments, this is not required and the absence of this information does not impugn the validity of his report. *See* 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) ("Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will

not make the report incomplete."). Accordingly, the Court finds that Dr. Wise's report reflected his judgments about the nature and severity of Plaintiff's gout and, therefore, qualified as a medical opinion.

Mr. Eschenroeder's October 2012 report contained similar information. Mr. Eschenroeder combined Plaintiff's self-reported symptoms with a summary of Plaintiff's treatment history at the VCU Health System Rheumatology Clinic. (R. at 321.) He noted Plaintiff's general assessment of his gout since his last visit, as well as his specific complaint of acute left knee pain. (R. at 321.) He discussed Plaintiff's social and family history and his relevant behaviors. (R. at 321.) Mr. Eschenroeder performed a physical examination of Plaintiff and recorded his findings, which included a disrupted gait due to left knee pain, swelling of the right third MCP, swelling over the right olecranon, as well as left knee warmth, tenderness, swelling and limited range of motion due to pain. (R. at 322.) Plaintiff's left great toe was tender to palpitation. (R. at 322.) He noted no problems with Plaintiff's right knee or ankles. (R. at 322.) Plaintiff's left leg strength was a four out of five on extension and flexion, and that his right leg strength was a five out of five. (R. at 322.) He recorded Plaintiff's most recent laboratory and imaging results, as well as his prescription medications. (R. at 322.) Mr. Eschenroeder concluded his report with his assessment and plan. (R. at 322.) He opined that Plaintiff's gout was poorly controlled and that he experienced attacks in his hands, elbows and feet every two weeks, as well as left knee pain that flared weekly. (R. at 322.) He prescribed Plaintiff a new medication to help with his gout, doubled the daily dose of one of Plaintiff's existing prescriptions, left two prescriptions unchanged, ordered blood work and instructed Plaintiff to quit drinking alcohol and limit his red meat and seafood intake. (R. at 322.) Like Dr. Wise's report, Mr. Eschenroeder's report reflected his judgments about the nature and severity of

Plaintiff's gout and, therefore, qualified as a medical opinion. Thus, Defendant's argument on this point fails.

> 2. The ALJ erred in failing to state the weight that she afforded to the opinions of Dr. Wise and Mr. Eschenroeder.

Plaintiff argues that the ALJ erred by not stating the weight that she gave to the opinions of Dr. Wise and Mr. Eschenroeder. (Pl.'s Mem. at 3.) Plaintiff contends that not only was the ALJ's failure to assign weight to Dr. Wise's and Mr. Eschenroeder's opinions error in its own right, but that this error was magnified because their opinions conflicted with the ALJ's determination that Plaintiff would miss only one day of work per month due to gout. (Pl.'s Mem. at 3-5.) This conclusion, in turn, was critical to the VE's testimony that Plaintiff could perform the jobs of routing clerk, sales attendant and laundry sorter. (Pl.'s Mem. at 3-5.) Defendant responds that the ALJ properly evaluated the medical opinions of Dr. Wise and Mr. Eschenroeder, because they each only saw Plaintiff once and, therefore, were not treating physicians. (Def.'s Mem. at 13.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 416.912(a)-(c); 20 C.F.R. §§ 404.1527, 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating physician, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent internally with each other or other evidence, the

ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating physician — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Unless the ALJ gives the treating physician's opinion controlling weight, she must explain in her decision the weight that she gave to opinions from treating sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "If the ALJ does not give the treating physician's opinion controlling weight, she must 'give good reasons in [her] notice of determination or decision for

the weight [she] give[s] [the] treating source's opinion.'" *Russell v. Comm'r of Soc. Sec.*, 440 F. App'x 163, 164 (4th Cir. 2011) (unpublished) (quoting 20 C.F.R. § 404.1527(c)(2)).[10] Determining the specific weight of medical opinions is particularly important because if there is any inconsistency between the opinions, the regulations require a comparative analysis of the competing medical opinions. *See, e.g.*, 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [plaintiff] than to the opinion of a source who has not examined [plaintiff].")

Requiring an ALJ to assign specific weight to medical opinions is necessary because a reviewing court "face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health, Ed. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). Unless the Commissioner "has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted). The assignment of weight must be sufficiently specific "to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for that weight." SSR 96-2p (discussing affording weight to treating physician). Accordingly, a reviewing court cannot determine if substantial evidence supports an ALJ's findings "unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980)); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259).

---

[10]    The Fourth Circuit cited to an earlier version of this regulation. This citation is to the current version of the regulation, which has been renumbered but not substantively changed.

Defendant correctly argues that Dr. Wise and Mr. Eschenroeder do not qualify as Plaintiff's treating physicians. Under the regulations, a treating physician is one "who has, or has had, an ongoing treatment relationship with" the claimant and that ongoing treatment has been of "a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [his] medical condition(s)." 20 C.F.R. §§ 404.1502, 416.902. The Fourth Circuit has held that a physician who has seen a patient only once is not a treating physician. *See Yost v. Barnhart*, 79 F. App'x 553, 555 (4th Cir. 2003) (unpublished) ("Dr. Massenberg evaluated Yost on only one occasion. Thus, he is not Yost's treating physician."). Because Dr. Wise and Mr. Eschenroeder each only saw Plaintiff once, they were not his treating physicians. However, this does not absolve the ALJ from her duty to assign weight to their opinions.

Both Dr. Wise and Mr. Eschenroeder qualify as nontreating sources under the Act. 20 C.F.R. §§ 404.1502, 416.902 ("Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you."). When the ALJ does not give a treating physician's opinion controlling weight, she must evaluate all medical opinions in the record and assign them weight based on the non-exhaustive list of factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). These factors include: (1) existence of an examining relationship; (2) existence, length and frequency of a treatment relationship; (3) supportability of the medical source opinion; (4) consistency of the medical source opinion; (5) specialization of the medical source; and (6) other factors. 20 C.F.R. §§ 404.1527(c), 416.927(c); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). Under these regulations, more weight is given to a treating source than an examining

28

source, and an examining source is given more weight than a non-examining source. 20 C.F.R. §§ 404.1527(c)(1)-(3), 416.927(c)(1)-(3).

In this case, the ALJ briefly referenced her obligation to consider the medical opinion evidence in the record, stating that she "ha[d] also considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p [sic]." (R. at 20.) Although the ALJ described and summarized certain portions of some of Plaintiff's medical records in her discussion of Plaintiff's RFC, at no point did she specifically discuss the opinions of any medical source, treating or examining, whether by name or implication. (R. at 21.) The ALJ provided no indication whatsoever of the weight, if any, that she afforded to any of Plaintiff's doctors or other medical providers, including Dr. Wise and Mr. Eschenroeder — two sources who examined Plaintiff. (R. at 20-22.) Defendant argues that the fact that the ALJ provided citations to their treatment records indicates that she did not ignore their opinions, but instead sufficiently considered them. (Def.'s Mem. at 15.) Further, Defendant claims that the fact that the ALJ recognized Plaintiff's gout as a severe impairment that significantly limited Plaintiff's work-related abilities — and accounted for those restrictions in her RFC determination — demonstrates that her evaluation was proper. (Def.'s Mem. at 15.) Contrary to Defendant's contentions, the ALJ erred in her treatment of the opinions of Dr. Wise and Mr. Eschenroeder.

In this case, the ALJ did not give controlling weight to the opinion of any treating physician. Under the regulations, therefore, the ALJ was required to weigh all of the medical opinions in the record, including the opinions of Plaintiff's examining physicians, according to the enumerated list of factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ failed to do so. Although she referenced Dr. Wise's and Mr. Eschenroeder's reports, the ALJ stated neither the

weight that she assigned to their opinions, nor the reasons for that weight. As the *Arnold* court explained, requiring an ALJ to assign specific weight to medical opinions is necessary because a reviewing court "face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." 567 F.2d at 259. Without a sufficiently specific explanation of the weight, if any, that the ALJ afforded to their opinions and the reasons for that weight, this Court cannot determine if substantial evidence supports her findings. *Gordon*, 725 F.2d at 235; *Stawls*, 596 F.2d at 1213. Therefore, the Court finds that the ALJ erred by failing to state the weight that she assigned to the opinions of Dr. Wise and Mr. Eschenroeder.

### C. The ALJ erred by failing to explain the weight that she gave to the state agency physician's opinion.

Plaintiff asserts that the ALJ erred as a matter of law by insufficiently explaining the weight that she afforded to the opinion of the state agency physician. (Pl.'s Mem. at 6.) Defendant counters that the ALJ's decision makes clear that she credited the state agency physician's opinion to the extent that it was supported by the evidence and, therefore, was appropriate. (Def.'s Mem. at 17.) Defendant further argues that even if the ALJ's explanation that she gave the stage agency physician's opinion "appropriate weight" was insufficiently descriptive, remand is not required because Plaintiff failed to bear his burden of establishing that using a different adjective would have changed the outcome of the case. (Def.'s Mem. at 17 (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).)

When considering a state agency medical consultant's opinion, the ALJ must evaluate those findings just as she would for any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). The ALJ must "explain in the decision the weight given to the opinions of a [s]tate agency medical . . . consultant . . . as the [ALJ] must do for any opinions from treating

sources, nontreating sources, and other nonexamining sources." 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii). Determining the specific weight of medical opinions is especially important, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [the plaintiff] than to the opinion of a source who has not examined [the plaintiff].") As with the medical opinions of treating and examining sources, the ALJ must assign weight with specificity to allow a reviewing court to determine if substantial evidence supports the ALJ's findings. *See, e.g.*, *Gordon*, 725 F.2d at 235 ("We cannot determine if findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all of the relevant evidence.")

In this case, the ALJ stated that she was required to treat the opinions of state agency medical and psychological consultants as expert opinion evidence from nonexamining sources. (R. at 22.) The ALJ went on to state that although she was not bound by his conclusions, she had considered Dr. Darden's opinion and given it "appropriate weight in rendering this decision." (R. at 22.) The ALJ provided no explanation of what she meant by "appropriate."

Because the ALJ simply stated that she assigned Dr. Darden's opinion "appropriate weight," this Court cannot identify — and therefore cannot review — the specific weight that she afforded the opinion. In giving "appropriate weight," the ALJ merely restated the requirement that she assign weight to the opinion. "Appropriate" in this context is merely conclusory and not sufficiently specific to quantify the weight that the ALJ assigned. Accordingly, the ALJ erred. *See Stawls*, 596 F.2d at 1213 (finding error where Secretary failed to indicate weight afforded certain medical opinions); *Derrickson v. Astrue*, 2012 WL 355502, at *13 (E.D. Va. June 29, 2012) (finding error where ALJ failed to afford weight to state agency physician's opinion and

"seemingly afford[ed]" it greater weight than treating physician). Therefore, this Court cannot say that substantial evidence supports the ALJ's determination. Because the ALJ did not sufficiently set forth the specific weight afforded to the state agency physician's opinion, the Court recommends remand for the Commissioner to indicate with explanation the specific weight. *See id.* at 236 ("We therefore remand . . . with directions . . . to indicate explicitly the weight afforded to the various medical reports in the record.")

    D. The ALJ's determination that Plaintiff would likely miss only one day of work per month

Because the Court finds that the ALJ failed to state the weight that she afforded to the opinions of Plaintiff's medical sources, as well as the state agency physician's opinion, the Court cannot determine whether the ALJ's conclusion that Plaintiff would likely miss only one day of work per month was supported by substantial evidence. *See Gordon*, 725 F.2d at 235 ("We cannot determine if findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all relevant evidence."). For this reason as well then, remand is necessary.

## VI.   CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED, and that the final decision of the Commissioner be VACATED AND REMANDED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: December 8, 2014